### In re BALKIND & JOSEPH.

### Appeal of HARMON & CO.

(Circuit Court of Appeals, Second Circuit. April 7, 1914.)

No. 110-149.

BANKRUPTCY (§ 115*)—RECLAMATION PROCEEDINGS—BAILMENT OR SALE—EVIDENCE.

In proceedings to reclaim certain goods from the receiver of an alleged bankrupt, evidence *held* insufficient to warrant a master's finding that the goods were consigned to the bankrupt and not sold.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 165; Dec. Dig. § 115.*]

Petitions to Revise and Appeal from Orders of the District Court of the United States for the Southern District of New York.

This cause comes here upon appeal from an order of the District Court, Southern District of New York, denying a petition in reclamation proceedings. Consolidated with this record is a petition to revise an order of Judge Holt confirming a composition offered by the alleged bankrupts.

The following is the opinion of Hand, District Judge, in the court below:

This is a motion to confirm the report of a special master appointed upon motion to reclaim certain chattels in the possession of the bankruptcy re-

---

ceiver. On April 24, 1913, a petition in bankruptcy was filed against the alleged bankrupts, and on the same day Judge Hazel appointed two receivers, who came into possession, among other assets, of 14 cases of rain coats and other garments, and three cases of piece goods. On April 30, 1913, the petitioner herein, Harmon & Co., procured an order to show cause from Judge Hazel for the return of this property upon a petition which alleged that "the goods were delivered to said alleged bankrupts on consignment, and accepted by them on the terms set forth in a letter of which the following is a copy." The letter is contained in the report of the master herein. To this the receivers replied on March 2, 1913, by an affidavit of Balkind, one of the alleged bankrupts, who swore that the letter in question, which bore date April 14, 1913, had not been typewritten or delivered until April 24th, and that the petitioner had, on April 14th, delivered the goods to him for sale; the terms being $2,000 in cash, and the balance upon notes at varying periods. He likewise swore that on April 24th he had advised the petitioner's president of his financial difficulty, and had signed the letter in question so as to give the color of a consignment to the transaction. He supported his affidavit with that of Lena Taxier, his stenographer. The petitioner's president replied by an affidavit of May 6th in which he said that the agreement of April 14th was as Balkind asserted, that is, a sale with the cash payment of $2,000, and notes at 30 and 60 days, except that the notes were to be secured by the assignment of good accounts. He likewise swore that on April 17th or 18th Balkind sent him a check for $2,000, and called upon him on the 19th or 21st to say that he did not wish to assign his accounts; that thereupon Harmon told him that he would take the goods back, to which Balkind suggested that the bankrupts hold them on consignment, and be paid a commission. To this Harmon says he agreed, the $2,000 already received to be considered as an advance upon the consigned goods. Later, on the 24th, when Harmon learned Balkind's financial difficulty, the letter in question was prepared between them.

On this showing Judge Holt referred the case to a special master, who has heard the testimony and reported in favor of the petitioner's version of the transaction. It is this report which comes up for confirmation.

Were it not for the report of the master in this case I should have no trouble in dismissing the petition, but it is always an embarrassing question to know at just what point the findings of the master should override the judge's conclusions upon reading the testimony. Both sides admit that the original transaction was a sale; both sides admit that the transaction of April 24th was after Harmon had learned of the bankruptcy or its immediate imminence; both sides also admit that on April 21st Harmon did not have any knowledge of the bankrupt's financial condition. Therefore the issue is narrowed down to the single question whether on April 21st the interview took place as Harmon asserts and as Balkind denies. The letter of the 24th is concededly a fabrication, and Harmon tried in his first showing to the court to make it appear that it stated the whole facts. His allegation that the goods were delivered in accordance with the terms of the letter of April 14th could only mean that the letter was actually written at its date and represented the original transaction. His explanation of this is that he supposed the change of April 21st, which he suppressed, related back to the outset. That was none the less most insincere, and I believe that at that time he expected Balkind to stand true to the agreement which they had made on April 24th, that the transaction should take the form of a consignment as of April 14th. Even if I were to believe that the transaction of April 21st actually occurred, yet Harmon intended to conceal the true facts, and have the matter slip through as a consignment from the outset. Now this affects very seriously Harmon's general credibility, for courts have, with justice, always regarded the falsification of documents as a matter of the greatest probative significance, and this was a very bald case, both in its origin and in Harmon's subsequent concealment of it.

The probabilities of the story are also strongly in favor of the receiver. Balkind was on the verge of bankruptcy on the 19th. It is most unlikely that he would, at such a time, have permitted $2,000 in cash to remain in Harmon's hands until he could sell enough goods, without getting any power to

dispose of them or any right to use the proceeds; at least unless he planned a fraud on Harmon. Of the greatest significance, too, is it that Balkind, on the 24th or 25th, sent Harmon a check for $100, the proceeds of his first sale of the rain coats, while by hypothesis he already had a credit of $2,000. There was absolutely no ground for doing this, if Harmon had title to the goods, as he says, but good reason for it, if, as Balkind says, he was frankly trying to prefer Harmon. It is true that the delivery of such a check in any event contradicted the story they had agreed upon on the 24th; yet that story might not stand, and in such a case Harmon would at least have the cash. The real importance of this incident is that it is wholly inconsistent with any honest belief that the goods were on consignment with a credit of $2,000, in itself a most unusual transaction even with a solvent man.

Again, why should Harmon have insisted upon security for the notes, when dealing with a man whose credit was as ample as he thought Balkind's? Of course, he might require it, but business usage is generally otherwise. And why, when Balkind refused to go on, did he assent to the change, when he had had other offers, and could not tell at what prices Balkind would sell? His more probable course was either to hold his solvent purchaser or to retake the goods for resale. Or, if we suppose it not unreasonable, which, perhaps, it was not, that he might assent, why not at that time in his own office, get from Balkind some document showing the change, and why not then give him the necessary billheads? All these things, small in themselves, have some cumulative force, when put together in the scale.

The whole story seems to me contradicted by all the circumstances, and by Harmon's own conduct, his petition, his actions on the 24th, and especially his retention of the check of $100. It is true that Balkind's testimony is weak; not only is he discredited in the falsification of testimony along with Harmon, but it was asserted at the bar and without contradiction, that he is now concerned in an effort to make a compromise with his creditors in which the retention of these goods is to be a part. I do not bear much on his story, nor upon the somewhat trivial contradiction raised by the stenographer's testimony as to who directed her to destroy her stenographic notes; for it is of small consequence who did. They were both concerned in a fraud of which this was a trifling incident. I do bear upon the circumstances which I have detailed, together with the fact that the petitioner has the burden of proof. These compel me to differ from the report and direct a denial of the petition.

W. D. Gaillard, of New York City, for petitioners.

Seldon Bacon and H. Francis Dyruff, both of New York City, for respondents.

Before LACOMBE, COXE, and ROGERS, Circuit Judges.

LACOMBE, Circuit Judge. The facts are set forth quite fully in Judge Hand's opinion. The Harmon Company, a banking company, originally owned the goods in question. Its president, Harmon, testified: That on April 14, 1913, he sold them to Balkind's concern for $2,000 cash and notes for $7,625 to be given and secured by assignment of accounts. That on the next day the goods were delivered, that on April 21st Balkind refused to give secured notes—it does not appear why—whereupon the contract of sale was canceled and a contract of consignment agreed to. That on April 24th Balkind called him on the telephone and asked to come to his store, which he did, whereupon he was informed that Balkind was on the edge of bankruptcy. That a letter was then written and signed by Balkind, dated back April 14th and stating that "as per conversation had with your Mr. Harmon we agreed to accept these goods on consignment." This was a manifest falsehood, as the witness himself concedes that no conversation arranging for a "consignment" was had before April 21st. Balkind contra-

dicted Harmon's testimony specifically and positively. The special master credited Harmon's narrative, but the District Judge reached a different conclusion.

We are persuaded, as was the District Judge, to a conclusion adverse to Harmon's narrative by the many suspicious circumstances which characterize it. The falsely dated letter is not the only one. The alleged agreement to take the goods on consignment contains no provision as to what commission should be paid or what should be done about the $2,000 already in Harmon's hands; it is difficult to conceive that Balkind on the brink of bankruptcy would have failed to make some effort to get back the large sum or have some definite understanding that it should be repaid out of the first proceeds of the goods he might sell. The alleged agreement, too, was very vague as to the prices at which the goods were to be sold; the goods were old and shop-worn, Harmon had been trying for some time to sell them, and the best offer he could get was 50 per cent. of invoice price. According to Harmon's narrative, although he had had trouble before with loans made to Balkind on assigned accounts, he agreed on April 14th to take notes secured by assigned accounts without any provision as to the character of such accounts. As he states his first contract Balkind might have carried out its terms by assigning old accounts which he had got tired of trying to collect. Harmon lets a week pass without getting the notes and then accepts Balkind's repudiation of his contract without question or objection. He says that on the 21st he had no idea that Balkind's firm was not entirely solvent, nevertheless although he had disposed of a lot of "hard sellers" at a price 5 per cent. better than he could obtain elsewhere and had $2,000 cash in hand on account of the purchase, it seems not to have occurred to him that he was in a position to make himself whole for the breach of the original contract.

When in addition to all this he undertakes in his first application to the court to convince it that there was an agreement to deliver goods on consignment made April 14th by submitting a letter falsely dated as of that day—and it subsequently appears on his own admission that there was not even a suggestion of delivery on commission before April 21st—his narrative of the whole transaction cannot be taken at its face value.

The order is affirmed.

It is unnecessary to discuss the order approving compromise; it is also affirmed.